GLICKSTEIN, Judge,
concurring in part and dissenting in part.
I concur with respect to the assessments of costs. In my judgment, it was error to admit evidence of a prior conviction of burglary. Jackson v. State, 498 So.2d 906, 909 (Fla.1986); Williams v. State, 511 So.2d 1017, 1019 (Fla. 2d DCA 1987). However, I conclude that the error as to the evidence of prior conviction was harmless, given the facts in this case, which I emphasize because of the necessity, in my view, of focusing upon the individual case. I could not adopt a per se rule which would require reversal of a conviction proven beyond a reasonable doubt, because evidence of a similar conviction was admitted. There are times, as here, when admission of such evidence is harmless beyond a reasonable doubt. I liken this to a Williams Rule violation that is harmless error in a given case.
At 3:12 a.m. on December 25,1985, Lieutenant Segee received a call of a burglary in progress at a doctor’s office. When Segee arrived at the scene, he observed two white males walk out the back door of the building. Segee shined his flashlight on the two men and stated, “Halt, police.” He had a good view of both individuals. When he identified himself, the shorter of the two men — later identified by Segee as appellant — ran around the northwest corner of the building and out of Segee’s view for a few seconds. After hearing over the radio that the shorter man had been apprehended by another officer, Segee pursued the taller man.
Segee subsequently saw appellant in the back of Officer Conry’s patrol car, and identified appellant as the person he had seen earlier. Appellant was wearing the same type and color coat and jeans as one of the individuals he had observed leaving the doctor’s office.
Officer Conry testified that approximately two seconds after receiving a radio description of the suspect from Lieutenant Segee, he spotted appellant and ran after him. He described the chase and arrest as follows:
*740 Q How much time elapsed from the time you heard it over the radio until the time you saw the person in the brown jacket?
A Probably two seconds, I would say, very short time.
Q Could you speak up?
A About two seconds.
Q All right. And what happened then?
A At that point I chased him from my position here. As soon as I saw him coming from this direction, I chased him from here, came across this house.
Q I have that marked with an arrow showing east direction.
A East direction, across Federal Highway, through the yard here, through the back yard.
Q When you say “yard,” what is this here?
A This is a residence, a private home. Q We will indicate that by the word “home.”
A As I turned around the corner of the building here, he was approximately this far ahead of me. I couldn’t tell you exactly in yards how far he was ahead of me, but as soon as I caught sight of him again, I lost sight of him for about maybe two seconds, he was running down the alley.
I started yelling at him to stop.
As we progressed, he finally stopped across on the south side of 12th Avenue, right in the driveway of this apartment building here.
Q How fast was he running?
A How fast?
Q Yes.
A Very fast.
Q Did he have any problem running?
A No.
Q Did he stumble?
A Not to my knowledge.
Q Did he fall?
A I didn’t see him fall, no.
Q When you lost sight of him for a second or two, just prior to you losing sight of him, did you get an idea, recognition of what he looked like, what he was wearing?
A The brown jacket that Sergeant Se-gee said he was wearing.
Officer Conry then described the statement which the defendant made to him:
Q After you read the defendant his rights, he stated he understood them, what did the defendant state to you, tell the jury, please?
A At that point I asked him if he wanted to tell me what had happened.
He said “Yes, I will tell you.”
He then told me that a friend of his— that he and a friend of his by the name of Nick went into the doctor’s office looking for money.
Q Could you speak up, please?
THE COURT: Is that off?
It’s off. I'm sorry.
THE WITNESS: He told me that he and a friend of his by the name of Nick went into the doctor’s office.
BY MR. WALLSHEIN:
Q Okay. Start over. Let’s just start over.
What did he first say to you?
A I asked him if he would be willing to tell me what had happened, what had transpired prior to his arrest.
He said yes, he would.
He told me that he and a friend of his by the name of Nick, the defendant did not know Nick’s last name, at any rate, the two of them went into the doctor’s office looking for money.
While this Nick was fishing through the receptionist’s desk, Nick — the defendant was acting as a lookout man for him.
Nick had handed him—
Q Handed who?
A Had handed the defendant $7, the defendant told me.
At that point I reached into the defendant’s pockets looking for the $7 and in his right front pocket I found $7 and a small white piece of paper with handwriting on it that had $13 in numbers, numerical.
I took that into evidence.
The defendant told me to gain entry into the building, what they first did was turn off or unscrew the floodlight bulb *741 that was at the southwest corner of the building.
Then they forced their way into the door with a screwdriver. They pried the latch from the door latch on the deadbolt lock, which we have photos of that.
Q Did you have an opportunity to go to that floodlight that was unscrewed?
A Yes. I went to it. I screwed it back in and it worked.
Q It was off at the time you first got to it?
A Yes, it was.
Q When you turned it back, screwed it back in, it turned back on at that point?
A Yes.
Q Was the defendant sweating and nervous at that time?
A Yes, he was very sweaty, panting from running.
Q Was he nervous?
A He appeared to be nervous, yes.
Q Did you smell an odor of an alcoholic beverage coming from the defendant’s mouth?
A Yes, there was an odor of alcohol coming from him.
Q Describe the weakness or strength of that odor?
A It’s really hard to determine. To me it smelled like a strong odor of alcohol. Q Do you have experience and training in terms of people who drive while under the influence of an alcoholic beverage? A Yes, I do.
Q You have had a course in that?
A Yes.
Q You made arrests regarding that?
A Yes, I have.
Q Based upon your experience, is it possible for somebody to have one drink a short time before coming in contact with you and have a strong odor of an alcoholic beverage?
A It’s possible, yes.
Q Was the defendant also breathing heavily upon you?
A Yes, he was.
Q Due to his running?
A Yes.
Q Did the defendant have any difficulty walking?
A No.
Q Everyday walking?
A No, he didn’t appear to have any problems walking.
Q Did the defendant stumble at all?
A No.
Q Did he stagger at all?
A No, he did not.
Q Any signs of intoxication?
A Not that I can recall, no.
Q When the defendant told you this confession of what occurred on March— on December 25, 1985, did he have any problem in talking to you about it, his conversation? Was his speech coherent?
A Yes, his speech was very coherent.
Q Was his speech slurred at all when he spoke with you?
A Not that I can recall, No.
Officer Rothbart was also at the scene, heard appellant describe the details of the burglary to Officer Conry, and testified that appellant had been drinking but did not appear to be intoxicated. No sobriety tests were given to appellant.
Dr. Pelino was called to his office to determine if anything had been taken in the burglary. He was not certain if any money had been taken from petty cash, but he did state that the white slip of paper that appellant had in his pocket contained the handwriting of his secretary.
At trial, appellant testified that he had started drinking at 3:00 p.m. on December 24, 1985. He also consumed some cocaine that day. He testified that he did not recall the burglary, but did recall waking up in the back of the police car. Appellant testified that he was under the influence of alcohol at the time.
Appellant was found guilty as charged of one count of burglary of a structure and of one count of petty theft. He was sentenced to five years with credit for time served as to the burglary conviction and to sixty days with sixty days credit for time served as to the petty theft conviction.